Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

TERRY BASSETT JR., derivatively on behalf of TATTOOED CHEF, INC.

     Plaintiff,

     v.

SALVATORE GALLETTI, STEPHANIE DIECKMANN, DAVID BORIS, PAULA CIARAMITARO, JENNIFER FELLNER, EDWARD GELFAND, RYAN OLOHAN, MARIE QUINTERO-JOHNSON, BRYAN ROSENBERG, and DANIEL WILLIAMSON,

     Defendants,

     and

TATTOOED CHEF, INC.,

     Nominal Defendant.

Case No.:

DEMAND FOR JURY TRIAL

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Terry Bassett Jr. ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Tattooed Chef, Inc. ("Tattooed Chef" or the "Company"), files this Verified Shareholder Derivative Complaint against Salvatore Galletti ("Galletti"), Stephanie Dieckmann ("Dieckmann"), David Boris ("Boris"), Paula Ciaramitaro ("Ciaramitaro"), Jennifer Fellner ("Fellner"), Edward Gelfand ("Gelfand"), Ryan Olohan ("Olohan"), Marie Quintero-Johnson ("Quintero-Johnson"), Bryan Rosenberg ("Rosenberg"), and Daniel Williamson ("Williamson") (collectively, the "Individual Defendants," and together with Tattooed Chef, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Tattooed Chef, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tattooed Chef, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Tattooed Chef's controlling shareholder, directors and officers from March 20, 2021 through October 12, 2022 (the "Relevant Period").

2.     Originally founded in 2009 as Ittella Parent, Tattooed Chef is a plant-based food company that primarily offers a broad portfolio of innovative frozen foods to customers. The Company's brand strategy involves introducing the attributes of a plant-based lifestyle to build a connection with customers seeking sustainably sourced, plant-based foods. The Company's food offerings accommodate preferences for flexitarian, vegetarian, vegan, organic, and gluten-free lifestyles.

3.     Throughout the Relevant Period, the Individual Defendants frequently emphasized to the investing public that the Company was committed to the continuous improvement of its internal control over financial reporting and that this was subject to diligent review. In addition, the Company filed numerous quarterly reports on Forms 10-Q with the SEC throughout the Relevant Period stating that its consolidated financial statements fairly presented the Company's financial position and were drafted in conformity with Generally Accepted Accounting Principles ("GAAP").

4.     In reality, not only was the Company failing to adequately review its internal control over financial reporting, but also the Company's improperly reported financial statements would violate GAAP and ultimately cause Tattooed Chef to restate over a year's worth of its financial statements, resulting in significant losses for the Company.

5.     The truth began to emerge on March 11, 2022 when the Company issued a press release revealing that on March 7, 2022, the Board concluded that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021 should no longer be relied upon. The press release revealed that these financial statements were no longer reliable because the Company did not properly record the tax effects associated with the Company's

issuance of 825,000 shares of its common stock to investment bank, Harrison Co., in June 2021.

6.     As a result, the Company disclosed that it would "restate the unaudited consolidated financial statements" at issue.

7.     On this news, the Company's share price fell $1.03 per share, or 9.07%, from closing at $11.36 per share on March 11, 2022 to close at $10.33 per share on March 14, 2022.

8.     Despite these revelations, the Individual Defendants continued to make false and misleading statements and omissions about the Company's internal control over financial reporting to the investing public in SEC filings, including in the annual report the Company filed with the SEC on Form 10-K on March 16, 2022 (the "2021 10-K").

9.     The truth did not fully emerge until after the market closed on October 12, 2022. That day, the Company filed a Form 8-K with the SEC which revealed that various of the Company's financial statements issued throughout the Relevant Period were "materially misstated and should no longer be relied upon and should be restated" because the Company had incorrectly recorded its expenses on several occasions. Specifically, the Company revealed that it had overstated revenue and understated losses for its "unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021, and September 30, 2021, and its audited annual consolidated financial statements for the year ended December 31, 2021." In addition, the Board, after consulting with the Audit Committee, determined that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2022 and June 30, 2022 should no longer be relied upon and would also need to be restated.

10.    On this news, Tattooed Chef's share price fell $0.44 per share, or 9.8%, from closing at $4.49 per share on October 12, 2022 to opening at $4.05 per share on October 13, 2022.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to Tattooed Chef by making and/or causing the Company to make a series of materially false and misleading statements to the investing public regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; (3) due to this, the Company would need to restate its previously filed financial statements for certain periods; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, Defendant Galletti sold Company shares at inflated prices for combined total proceeds of over $8,000,000.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company

and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's and CFO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1); Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9; and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the

Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Tattooed Chef and has continuously held Tattooed Chef common stock at all relevant times.

### Nominal Defendant Tattooed Chef

22.     Tattooed Chef is a Delaware corporation with its principal executive offices at 6305 Alondra Boulevard, Paramount, California 90723. Tattooed Chef's shares trade on NASDAQ under the ticker symbol "TTCF."

### Defendant Galletti

23.     Defendant Galletti has served as the Company's CEO and President since its founding in 2009 and as a Company director since 2020. According to the Company's Schedule 14A filed with the SEC on April 21, 2022 (the "2022 Proxy Statement"), as of April 4, 2022, Defendant Galletti beneficially owned 31,420,522 shares of the Company's common stock, representing 38.2% of the Company's outstanding shares, thus making Defendant Galletti a controlling shareholder of the Company. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Galletti owned approximately $384.9 million worth of Tattooed Chef stock.

24.     For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Galletti received $375,000 in total compensation from the Company, made up entirely of his salary. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Galletti received $387,067 in total compensation from the Company. This included $272,095 in salary, $100,000 in stock awards, and $14,972 in all other compensation.

Verified Shareholder Derivative Complaint

25.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Galletti made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 15, 2021 | 800,000 | $10.00 | $8,000,000 |

Thus, in total, before the fraud was exposed, he sold 800,000 shares of Company stock on inside information, for which he received approximately $8,000,000 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26.     The 2022 Proxy Statement stated the following about Defendant Galletti:

Salvatore "Sam" Galletti has served as our President and CEO since our founding in 2009 as Stonegate Foods, Inc. Mr. Galletti has over 35 years' experience in the food industry including prior operational and investor roles at Tattooed Chef, Sonora Mills, Good Karma Foods, and others, where he gained experience manufacturing a variety of products including seafood, breaded vegetables, grilled chicken and other organic foods. Through these prior roles, he has established key relationships with many of the retailers who now carry our products. Mr. Galletti initially intended that we be primarily an importer of Italian vegetables and other products, having realized the quality of produce from Italy surpassed that of available comparable produce from the U.S. Following our entrance into private label production and manufacturing of frozen products in our own facility, the name was changed to Ittella International in 2015. Mr. Galletti also serves as one of our directors.

**Defendant Dieckmann**

27.     Defendant Dieckmann has served as the Company's CFO since November 2021. Prior to this, Defendant Dieckmann served as the Company's Chief Operating Officer ("COO") from 2017 to 2021. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Dieckmann beneficially owned 500,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on April 4, 2022 was $12.25, Defendant Dieckmann owned approximately $6.1 million worth of Tattooed Chef stock.

28.    For the 2021 Fiscal Year, Defendant Dieckmann received $380,423 in total compensation from the Company. This included $280,423 in salary and $100,000 in all other compensation. For the 2020 Fiscal Year, Defendant Dieckmann received $13,203,846 in total compensation from the Company. This included $163,846 in salary and $13,040,000 in all other compensation.

29.    The 2022 Proxy Statement stated the following about Defendant Dieckmann:

> Stephanie Dieckmann served as our COO from 2017 to 2021 and currently serves as our CFO. She has over 12 years of combined food industry experience. In her role as CFO, she oversees all of our accounting, business support, financial planning and analysis, treasury, real estate and tax functions. Ms. Dieckmann was appointed as our CFO on April 15, 2021. In her role as COO, Ms. Dieckmann is primarily responsible for all operations in the U.S. and helped spearheaded growth from approximately $32.5 million in sales in 2017 to approximately $148.5 million in 2020. Prior to joining us, Ms. Dieckmann was CFO at APPA Fine Foods, a private label food manufacturer of fresh ready to eat, frozen meals, and grilled chicken products, where she worked for over seven years. She also held a financial controller position with The Perfect Bite Co., a gourmet frozen appetizer company. During her time at APPA Fine Foods, Ms. Dieckmann became acquainted with Mr. Galletti, who was a former investor in that company.

**Defendant Boris**

30.    Defendant Boris has served as a Company director since 2018. Defendant Boris also serves as a member of the Compensation Committee. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Boris beneficially owned 4,935 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Boris owned approximately $60,454 worth of Tattooed Chef stock.

31.    For the 2021 Fiscal Year, Defendant Boris received $100,000 in total compensation from the Company made up entirely of cash. For the 2020 Fiscal Year,

Defendant Boris received $100,000 in total compensation from the Company made up entirely of stock awards.

32.     The 2022 Proxy Statement stated the following about Defendant Boris:

David Boris has served as Co-Chief Executive Officer, Chief Financial Officer and Director of Forum Merger I Corporation ("Forum I") from its inception in November 2016 until Forum I's business combination with ConvergeOne and served as a member of ConvergeOne's board of directors from the business combination until ConvergeOne's acquisition by CVC in January 2019 at $12.50 per share. He was Co-Chief Executive Officer, Chief Financial Officer and Director of Forum Merger II Corp from its inception in August 2018 until its business combination with Myjojo, Inc. Mr. Boris was the Co-Chief Executive Officer, Chief Financial Officer and Director of Forum Merger III Corp until its merger with Electric Last Mile Solutions. He is currently Co-CEO and CFO of Forum Merger IV Corp. Mr. Boris has been the Co-Chief Executive Officer of Form Merger IV Corp. since March 2021. He has over 30 years of Wall Street experience in mergers and corporate finance and has been involved in approximately 20 SPAC transactions as an advisor, investment banker and/or officer or board member, including over ten business combinations totaling over $5.0 billion. Mr. Boris was a Director of Pacific Special Acquisition Corp. from July 2015 until August 2017. From November 2010 to May 2013, Mr. Boris served as Chairman of Primcogent Solutions LLC, leading the board during the period of the company's preparation to seek reorganization by way of a voluntary bankruptcy petition, which was filed in 2013. Mr. Boris served as Senior Managing Director and Head of Investment Banking at Pali Capital, Inc., an investment banking firm, from 2007. Mr. Boris served as President of Ladenburg Thalmann Group Inc. from 1999 to 2000, and was also Executive Vice President and Head of Investment Banking at Ladenburg Thalmann & Co. Inc. from 1998 to 2000. In addition, he was a co-founder, director, and a principal stockholder of Brenner Securities Corporation and its successors. Prior to Brenner, Mr. Boris was at Oppenheimer & Company Inc., as a Senior Vice President and Limited Partner. Mr. Boris began his career as a member of the Business Development Group of W.R. Grace & Company, from 1984 to 1985. He is an active member of the Young Presidents' Organization, an organization with over 25,000 members who are in the top position of a qualifying company or division and are directly responsible for all operations of such business or division. Mr. Boris received a M.B.A. from Columbia University Business School and a B.A. from Vassar College, cum laude.

**Defendant Ciaramitaro**

33.     Defendant Ciaramitaro has served as a Company director since 2020. Defendant Ciaramitaro also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Ciaramitaro beneficially owned 9,930 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Ciaramitaro owned approximately $121,643 worth of Tattooed Chef stock.

34.     For the 2021 Fiscal Year, Defendant Ciaramitaro received $100,000 in total compensation from the Company. This included $99,983 in stock awards and $17 in cash. For the 2020 Fiscal Year, Defendant Ciaramitaro received $100,000 in total compensation from the Company made up entirely of stock awards.

35.     The 2022 Proxy Statement stated the following about Defendant Ciaramitaro:

> Paula Ann Ciaramitaro is a seasoned financial executive with more than 25 years of experience in the food industry. She has served as the Controller for J&D Seafoods, Inc. since 1994 and has extensive experience managing accounts receivable, accounts payable, inventory and trading, product sourcing and creation, developing trading strategies in a very competitive seafood market, and much more. Prior to her position with J&D Seafoods, she founded her own travel agency, M.A.P. Travel, Inc., which she operated from 1982 to 1987. Through June 30, 2020, Ms. Ciaramitaro served as the President of the University of Southern California ("USC" or the "University") Town and Gown, which is the largest USC alumni organization in existence and oversaw a $46 million budget for the organization. She currently serves as an advisor to the Board of Town and Gown. She has been highly involved with philanthropic and fundraising efforts for the University and was instrumental in working with the USC Board of Trustees to coordinate a $6 billion fundraising effort for the University. She graduated from the University of Southern California in 1985 with a B.S. in Business Administration and a Master of Business Administration from the University of Phoenix in June 2010.

**Defendant Fellner**

36.    Defendant Fellner has served as a Company director since 2020. Defendant Fellner also serves as a member of the Compensation Committee. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Fellner beneficially owned 7,471 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Fellner owned approximately $91,520 worth of Tattooed Chef stock.

37.    For the 2021 Fiscal Year, Defendant Fellner received $100,000 in total compensation from the Company. This included $48,000 in stock awards and $52,000 in cash. For the 2020 Fiscal Year, Defendant Fellner received $100,000 in total compensation from the Company made up entirely of stock awards.

38.    The 2022 Proxy Statement stated the following about Defendant Fellner:

Jennifer Fellner is a veteran communications consultant with 30 years of broad public relations experience at national communication agencies helping a wide range of clients from start-ups developing brands to Fortune 500 companies successfully communicating with stakeholders across industries spanning consumer products, technology, food and politics. She has been privileged to work with brands such as Apple Computer, Annie's Organics, Brinker International, Clif Bar, ESPN, Hasbro, Horizon Organic, Intuit, LeapFrog Toys, Lundberg Family Farms, Peet's Coffee & Tea, Polycom, Safeway, SEGA, Seiko and Toys "R" Us among others. Dedicated to delivering fresh ideas, measurable results and strategic insights, she recently founded Ally Advisers, a Communications Consultancy. Ms. Fellner's focus on reputation management and sustainability gives her deep experience in financial communications, executive communications, influencer relations and social media, as well as issues management, counseling clients with challenges ranging from exploding toys, food manufacturing safety issues and online financial fraud. Ms. Fellner's focus on Reputation Management and Sustainability gives her deep experience in financial communications, executive communications and speechwriting, as well as crisis communications and issues management, counseling clients with challenges ranging from exploding toys, food tampering to online financial fraud. Ms. Fellner was contracted to provide marketing assistance to us for the year ended December 31, 2021. Ms. Fellner directed all aspects

of marketing communication including advertising, digital, social and content initiatives, promotions, PR, events and partnerships and led the annual marketing function planning process, establishing marketing goals and strategies, tactical plans, and a performance dashboard that includes all critical key performance indicators. We paid approximately $0.10 million for the services provided during the year ended December 31, 2021.

**Defendant Gelfand**

39.     Defendant Gelfand has served as a Company director since 2020. Defendant Gelfand also serves as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Gelfand beneficially owned 7,471 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Gelfand owned approximately $91,520 worth of Tattooed Chef stock.

40.     For the 2021 Fiscal Year, Defendant Gelfand received $125,000 in total compensation from the Company. This included $48,000 in stock awards and $77,000 in cash. For the 2020 Fiscal Year, Defendant Gelfand received $100,000 in total compensation from the Company made up entirely of stock awards.

41.     The 2022 Proxy Statement stated the following about Defendant Gelfand:

Edward Gelfand has over four decades of combined legal experience involving business and securities regulation. Mr. Gelfand specializes in public and private securities offerings and syndications, securities compliance and transactions, public company filings, merger and acquisitions, as well as other related practices, including SEC and FINRA defense representation. Mr. Gelfand is an active member of the State Bar of California, and is a partner in the law firm of Gartenberg Gelfand Hayton LLP and also serves as of counsel to the law firm of Gundzik Heeger LLP. Mr. Gelfand has served and continues to serve as corporate securities counsel for several SEC-reporting public companies, including QS Energy, Inc., Rightscorp Inc., Iroquois Valley Farmland REIT, PBC (Regulation A+), Massroots, Inc. and PPOL, Inc. He also serves as corporate counsel to numerous private companies and individuals. Mr. Gelfand has experience across a wide range of industries, including broker-dealers, investment advisers, restaurants, film distribution pro boxing, renewable energies,

aeronautics, auto racing, and real estate. Mr. Gelfand has been engaged in private and government practice since 1976. He has previously served as a staff attorney, special counsel, and as a Chief, Branch of Enforcement, in the Los Angeles Regional Office of the U.S. Securities and Exchange Commission. He has also served as an arbitrator for the NASD, now Financial Industry Regulatory Authority (FINRA), and been appointed as a receiver by numerous federal courts. Mr. Gelfand received a B.S. from Roosevelt University in 1970, and a J.D. from the University of San Fernando Valley College of Law in 1976.

**Defendant Olohan**

42.    Defendant Olohan has served as a Company director since 2020. Defendant Olohan also serves as Chairman of the Food Safety Committee. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Olohan beneficially owned 7,471 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Olohan owned approximately $91,520 worth of Tattooed Chef stock.

43.    For the 2021 Fiscal Year, Defendant Olohan received $100,000 in total compensation from the Company. This included $48,000 in stock awards and $52,000 in cash. For the 2020 Fiscal Year, Defendant Olohan received $100,000 in total compensation from the Company made up entirely of stock awards.

44.    The 2022 Proxy Statement stated the following about Defendant Olohan:

Ryan Olohan is the managing director of Food, Beverage and Restaurants at Google. Ryan started his career at Google in 2007, first overseeing the consumer packaged goods industry and has spent the past seven years as a thought leader in healthcare as the Managing Director of Google Healthcare. He leads the teams responsible for developing and managing Google's relationships with the foremost innovators in the food, beverage and restaurant space. Mr. Olohan's teams partner with the largest restaurant advertisers in the world to build their brands though utilizing Google's vast search, display, mobile, online video, and other platforms. As head of the Food Industry team, Mr. Olohan is responsible for driving the teams' strategy, industry and consumer insights, operational excellence, and thought leadership.

**Defendant Quintero-Johnson**

45.   Defendant Quintero-Johnson has served as a Company director since 2020. Defendant Quintero-Johnson also serves as a member of the Audit Committee and the Food Safety Committee. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Quintero-Johnson beneficially owned 4,935 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Quintero-Johnson owned approximately $60,454 worth of Tattooed Chef stock.

46.   For the 2021 Fiscal Year, Defendant Quintero-Johnson received $100,000 in total compensation from the Company made up entirely of cash. For the 2020 Fiscal Year, Defendant Quintero-Johnson received $100,000 in total compensation from the Company made up entirely of stock awards.

47.   The 2022 Proxy Statement stated the following about Defendant Quintero-Johnson:

> Marie Quintero-Johnson has over 30 years of combined food and beverage experience. Currently, she serves as Vice President, M&A, Insights, and Corporate Real Estate for The Coca-Cola Company, a role she has held since 2002. In her current role, Ms. Quintero-Johnson supports the development and implementation of Coca-Cola's global strategy through various growth, efficiency, and scale initiatives. During her tenure, the Coca-Cola Company has completed more than $40 billion worth of transactions in over 100 countries, and has significantly increased the number of brands under its corporate umbrella. Prior to joining the Coca-Cola Company in 1992, Ms. Quintero-Johnson began her career at Coopers & Lybrand (n.k.a PricewaterhouseCoopers). Ms. Quintero-Johnson currently sits on the Board of Coca-Cola Beverages Africa, Coca-Cola Bottling of Egypt, Atlanta Downtown Improvement District, and Cristo Rey Atlanta high School. She received her M.B.A. from the Darden Graduate School of Business Administration, University of Virginia, and her B.S. in Accounting and International Business from Georgetown University. Ms. Quintero-Johnson is a Certified Public Accountant.

**Defendant Rosenberg**

48.    Defendant Rosenberg has served as a Company director since 2020. Defendant Rosenberg also serves as Chairman of the Compensation Committee and as a member of the Food Safety Committee. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Rosenberg beneficially owned 7,471 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Rosenberg owned approximately $91,520 worth of Tattooed Chef stock.

49.    For the 2021 Fiscal Year, Defendant Rosenberg received $125,000 in total compensation from the Company. This included $48,000 in stock awards and $77,000 in cash. For the 2020 Fiscal Year, Defendant Rosenberg received $100,000 in total compensation from the Company which was made up entirely of stock awards.

50.    The 2022 Proxy Statement stated the following about Defendant Rosenberg:

Bryan Rosenberg has held executive management positions within food and beverage companies for over 30 years. Mr. Rosenberg is the President and CEO of Thai Union North America. He is responsible for its two operating companies, Chicken of the Sea International (COSI) and Chicken of the Sea Frozen Foods (COSFF). The two subsidiaries have annual revenue of approximately $1.4 billion and provide the greatest portion of revenue globally for Thai Union, the world's largest producer of shelf-stable tuna products with annual sales exceeding $4.3 billion and a global workforce of over 47,000 people. Prior to his current role, Mr. Rosenberg served as President and CEO of COSFF since he established the Company in 2006 in partnership with Thai Union. Under Mr. Rosenberg's leadership, COSFF has become the largest importer of shrimp, lobster, and crab meat in the US, selling into all channels of trade with annual revenue approaching $1.1 billion. Mr. Rosenberg also serves on the Board of Advisors for the Department of Economics at University of California, Santa Barbara, where he is a Magna Cum Laude graduate with a B.A. in Business Economics.

**Defendant Williamson**

51.    Defendant Williamson has served as a Company director since 2020. Defendant Williamson also serves as Chairman of the Nominating and Corporate

Governance Committee. According to the 2022 Proxy Statement, as of April 4, 2022, Defendant Williamson owned 259,930 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2022 was $12.25, Defendant Williamson owned approximately $3.2 million worth of Tattooed Chef stock.

52.    For the 2021 Fiscal Year, Defendant Williamson received $100,000 in total compensation from the Company. This included $99,983 in stock awards and $17 in cash. For the 2020 Fiscal Year, Defendant Williamson received $100,000 in total compensation from the Company which consisted entirely of stock awards.

53.    The 2022 Proxy Statement stated the following about Defendant Williamson:

> Daniel Williamson is currently a consultant and private investor. Mr. Williamson was the founder and past President and CEO of Aspen Medical Products from October 1993 until November 2020. He was responsible for their global operations with offices in United States, Mexico, Germany and Scotland. He was the majority owner of the business until it was sold to the Cortec Group in 2019. Under his leadership, Aspen Medical Products became the premier leader in Spinal Bracing. Prior to founding Aspen Medical Products, Mr. Williamson was the COO and CFO for California Medical Products from 1988 to 1991, and the General Manager for Ladera Medical California from 1991 to 1995, to whom California Medical Products was sold in 1991. Mr. Williamson began his career in 1978 at American Hospital Supply Corporation, which subsequently merged with Baxter International. He has held positions in operations, finance and accounting for multiple divisions of both companies. Mr. Williamson won the EY Entrepreneur Award for Orange County CA in 2017 for his innovative leadership at Aspen. Mr. Williamson also serves as the Chairman of Alger Precision Manufacturing, Reflections Holdings and Deep Roots Bible Curriculum. He is also on the Board of Focal Point Ministries and The Premier Christian Education Group. Mr. Williamson has a Bachelor of Science degree in Accounting from Miami University in Ohio and holds a CPA.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

54.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Tattooed Chef and because of their ability to control the business and corporate affairs of Tattooed Chef, the Individual Defendants owed Tattooed Chef and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tattooed Chef in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tattooed Chef and its shareholders so as to benefit all shareholders equally.

55.     Each controlling shareholder, director and officer of the Company owes to Tattooed Chef and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of Tattooed Chef, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.     To discharge their duties, the controlling shareholder, officers and directors of Tattooed Chef were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors and officers of Tattooed Chef, the absence of good faith

on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Tattooed Chef's Board at all relevant times.

59. As controlling shareholder, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

60. To discharge their duties, the controlling shareholder, officers and directors of Tattooed Chef were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers and directors of Tattooed Chef were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Tattooed Chef's own Code of Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Tattooed Chef conducted its operations, and, upon receipt of notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Tattooed Chef and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tattooed Chef's operations would comply with all applicable laws and Tattooed Chef's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.    Each of the Individual Defendants further owed to Tattooed Chef and the shareholders the duty of loyalty requiring that each favor Tattooed Chef's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Tattooed Chef and were at all times acting within the course and scope of such agency.

63.    Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Tattooed Chef, each of the Individual Defendants had access to adverse, non-public information about the Company.

64.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tattooed Chef.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the

Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

67.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Tattooed Chef was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tattooed Chef, and was at all times acting within the course and scope of such agency.

## TATTOOED CHEF'S CODE OF ETHICS

70.   Tattooed Chef's Code of Ethics was adopted by the Board to, among other things, promote "honest and ethical conduct" and "compliance with applicable governmental laws, rules and regulations." The Code of Ethics states that it is "applicable to all of the Company's directors, officers, and employees."

71.     In a section titled, "Honest, Ethical and Fair Conduct," the Code of Ethics states the following, in relevant part:

1. Each person must:

- Avoid conflicts of interest, wherever possible, except as may be allowed under guidelines or resolutions approved by the Board (or the appropriate committee of the Board) or as disclosed in the Company's public filings with the SEC. Anything that would be a conflict for a person subject to this Code also will be a conflict for a member of his or her immediate family or any other close relative.

72.     In a section titled, "Financial Statements and Other Records," the Code of Ethics states the following:

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Board or the Company's internal or external legal counsel.

73.     In a section titled, "Disclosure," the Code of Ethics states the following, in relevant part:

The Company strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must:

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accountants, governmental regulators, self-regulating organizations and other governmental officials, as appropriate; and
- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

In addition to the foregoing, the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO") of the Company and each subsidiary of the Company (or persons performing similar functions), and each other person that typically is involved in the financial reporting of the Company, must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.

74.    In a section titled, "Compliance," the Code of Ethics states the following, in relevant part:

It is the Company's obligation and policy to comply with all applicable governmental laws, rules and regulations. All directors, officers and employees of the Company are expected to understand, respect and comply with all of the laws, regulations, policies and procedures that apply to them in their positions with the Company. Employees are responsible for talking to their supervisors to determine which laws, regulations and Company policies apply to their position and what training is necessary to understand and comply with them.

75.    In a section titled, "Reporting and Accountability," the Code of Ethics states the following, in relevant part:

The Board, or a committee designated by the Board for such purpose, is responsible for applying this Code to specific situations in which questions are presented to it and has the authority to interpret this Code in any particular situation. Any person who becomes aware of any existing or potential breach of this Code is required to notify the Chairperson of the Board promptly. Failure to do so is, in and of itself, a breach of this Code.

76.    In a section titled, "Insider Information and Securities Trading," the Code of Ethics states the following, in relevant part:

No person who is aware of material, non-public information about the Company may, directly or indirectly, buy or sell the Company's securities or engage in another action to take advantage of such information. It is also against the law to trade or to "tip" others who might make an investment decision based on material, non-public information about the Company. For example, using material, non-public information to buy or sell the Company's securities, options in the Company's securities or the securities of any Company supplier, customer or competitor is prohibited. The consequences of insider trading violations can be severe. These rules also apply to the use of material, nonpublic information about other companies

(including, for example, our customers, competitors and potential business partners).

77.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof. Moreover, one of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## TATTOOED CHEF'S AUDIT COMMITTEE CHARTER

78.     The Company also maintains an Audit Committee Charter (the "Charter"). Regarding the Company's annual Forms 10-K, the Charter states that the Audit Committee will "[r]eview and discuss the annual audited financial statements and the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations' with management and the independent registered public accounting firm."

79.     Likewise, with respect to the Company's quarterly Forms 10-Q, the Charter states that the Audit Committee will "[r]eview and discuss the quarterly financial statements and the Company's disclosures provided in periodic quarterly reports including 'Management's Discussion and Analysis of Financial Condition and Results of Operations' with management, the senior internal auditing executive (or outside internal auditing principal, if applicable) and the independent registered public accounting firm."

80.     Moreover, with respect to the Company's earnings press releases, the Charter provides that the Audit Committee will "[d]iscuss policies and procedures

concerning earnings press releases and review the type and presentation of information to be included in earnings press releases (paying particular attention to any use of 'pro forma' or 'adjusted' non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies."

81. With respect to risk assessment and management, the Charter states that the Audit Committee will "[d]iscuss policies and guidelines to govern the process by which risk assessment and risk management is undertaken" and "[m]eet periodically (not less than annually) with management to review and assess the Company's major financial risk exposures and the manner in which such risks are being monitored and controlled."

82. Finally, with respect to the Company's internal control over financial reporting, the Charter states that the Audit Committee will:

> Review with the chief executive officer, chief financial officer, and independent registered public accounting firm, periodically, the following:
>
> - all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
>
> - any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

83. Tattooed Chef is a plant-based food company that primarily offers a broad portfolio of innovative frozen foods to customers. The Company's brand strategy involves introducing the attributes of a plant-based lifestyle to build a connection with customers seeking sustainably sourced, plant-based foods. The Company's food offerings accommodate preferences for flexitarian, vegetarian, vegan, organic, and gluten-free lifestyles.

84.     During the Relevant Period, the Individual Defendants frequently emphasized that the Company was "committed to the continuous improvement of [its] internal control over financial reporting" and that it would "continue to diligently review [its] internal control over financial reporting." Additionally, in various quarterly reports filed with the SEC on Forms 10-Q throughout the Relevant Period, the Company stated that its management had "concluded that [its] consolidated financial statements present[ed] fairly, in all material respects, [the Company's] financial position and were drafted "in conformity with U.S. GAAP."

85.     The truth began to emerge on March 11, 2022 when the Company issued a press release titled "Tattooed Chef to Restate 2021 Quarterly Financial Statements to Recognize Deferred Tax Asset," disclosing that the Board had concluded on March 7, 2022 that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021 should no longer be relied upon because the Company had failed to properly record the tax effects associated with the Company's issuance of 825,000 shares of its common stock to Harrison Co., the Company's investment bank, in June 2021. The March 11, 2022 press release also stated that the Company would restate prior period financial statements for each of the quarterly periods ended March 31, 2021, June 30, 2021, and September 30, 2021.

86.     On this news, the Company's share price fell $1.03 per share, or 9.07%, from closing at $11.36 per share on March 11, 2022 to close at $10.33 per share on March 14, 2022.

87.     The truth fully emerged on October 12, 2022, when, after markets closed, the Company filed a Form 8-K with the SEC, disclosing that various of the Company's financial statements issued throughout the Relevant Period were "materially misstated and should no longer be relied upon and should be restated" because the Company had incorrectly recorded its expenses on several occasions. Specifically, the Company

revealed that it had overstated revenue and understated losses for its "unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021, and September 30, 2021, and its audited annual consolidated financial statements for the year ended December 31, 2021." In addition, the Board, after consulting with the Audit Committee, determined that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2022 and June 30, 2022 should no longer be relied upon and would also need to be restated.

88. On this news, the Company's share price fell $0.44 per share, or 9.8%, from closing at $4.49 per share on October 12, 2022 to opening at $4.05 per share on October 13, 2022.

**False and Misleading Statements**

***March 19, 2021 Form 10-K***

89. On March 19, 2021, after markets closed, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 10-K"), which was signed by Defendants Galletti, Rosenberg, Ciaramitaro, Gelfand, Williamson, Fellner, Olohan, Boris, and Quintero-Johnson. Attached to the 2020 10-K were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Galletti and non-party Charles F. Cargile attesting to the accuracy of the 2020 10-K.

90. The 2020 10-K downplayed the serious problems the Company was facing with its internal controls. It stated the following about the Company's "Controls and Procedures," in relevant part:

> We have begun the process of, and we are focused on, designing and implementing effective internal controls measures to improve our internal control over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:
>
> ● We hired qualified staff and outside resources to segregate key functions within our financial and information technology processes supporting our internal controls over financial reporting.

● We developed internal controls documentation, including comprehensive accounting policies and procedures and designed, implemented, and tested new controls over key financial processes.

While these actions and planned actions are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles, *we are committed to the continuous improvement of our internal control over financial reporting and will continue to diligently review our internal control over financial reporting*.

(Emphasis added.)

91.     The statements in paragraph ¶ 90 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 16, 2021 Proxy Statement*

92.     On April 16, 2021, the Company filed a Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Galletti, Boris, Ciaramitaro, Fellner, Gelfand, Olohan, Quintero-Johnson, Rosenberg, and Williamson solicited the 2021 Proxy Statement which contained material misstatements and omissions.

93.     The 2021 Proxy Statement called for Company shareholders to vote to, *inter alia*, (1) elect Defendants Boris, Olohan, and Quintero-Johnson to the Board; (2) ratify the appointment of BDO USA, LLP ("BDO") as the Company's independent registered public accounting firm for the 2021 Fiscal Year; and (3) approve an amendment to the Company's 2020 Equity Incentive Plan (the "Plan") to increase the maximum annual amount of shares that may be granted under the Plan to any non-employee director who

serves as chairperson of a duly formed and authorized committee of the Board, when taken together with any cash fees paid to that director, by $25,000 to $125,000 (the "Incentive Amendment Proposal").

94.    With respect to the Company's Code of Ethics, the 2021 Proxy Statement stated the following:

> We have adopted a code of ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. The code of ethics is available on our website at www.tattooedchef.com. To the extent required by law, we expect to disclose any amendments to the code, or any waivers of its requirements, on our website.

95.    Regarding the "Board's Role in Risk Oversight," the 2021 Proxy Statement stated the following:

> The Board has ultimate responsibility for oversight of our risk management processes. The Board discharges this oversight responsibility through regular reports received from and discussions with senior management on areas of material risk exposure to us. The Board of Directors has overall responsibility for risk oversight, including, as part of regular Board and committee meetings, general oversight of executives' management of risks relevant to the Company. While the full Board has overall responsibility for risk oversight and is currently overseeing our business continuity risks, such as risks relating to the COVID-19 pandemic, it is supported in this function by its audit committee, compensation committee, nominating and corporate governance committee, and food safety committee. Each of the committees regularly reports to the Board.

96.    The 2021 Proxy Statement was materially misleading because it failed to disclose that: (1) though the Company claimed its employees, officers and directors adhered to the Code of Ethics and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Ethics either without waivers or without such waivers being disclosed; and (2) contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it.

97.    The 2021 Proxy Statement was also materially misleading because it failed to disclose, *inter alia*, that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

98.    As a result of Defendants Galletti, Boris, Ciaramitaro, Fellner, Gelfand, Olohan, Quintero-Johnson, Rosenberg, and Williamson causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants Boris, Olohan, and Quintero-Johnson to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) approve the Incentive Amendment Proposal, providing various of the Individual Defendants with material benefits.

**May 18, 2021 Form 10-Q**

99.    On May 18, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2021 (the "1Q 2021 10-Q"), which was signed by Defendants Galletti and Dieckmann. Attached to the 1Q 2021 10-Q were certifications pursuant to Rule 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Galletti and Dieckmann attesting to the accuracy of the 1Q 2021 10-Q.

100.    The 1Q 2021 10-Q revealed that, for the three months ended March 31, 2021, the Company reported a net revenue of $52,682,000 and a net loss of $8,152,000.

101.    The 1Q 2021 10-Q also downplayed the serious problems the Company was facing with its internal controls. It stated the following about the Company's "Controls and Procedures," in relevant part:

> We have begun the process of, and we are focused on, designing and
> implementing effective internal controls measures to improve our internal

control over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:

● We hired qualified staff and outside resources to segregate key functions within our financial and information technology processes supporting our internal controls over financial reporting.

● We developed internal controls documentation, including comprehensive accounting policies and procedures and designed, implemented, and tested new controls over key financial processes.

While these actions and planned actions are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles, we are committed to the continuous improvement of our internal control over financial reporting and will continue to diligently review our internal control over financial reporting.

102.   Additionally, the subsection of "Controls and Procedures" titled "Evaluation of Disclosure Controls and Procedures" stated the following:

Our management, with the participation of our chief executive officer and chief financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of March 31, 2021, our disclosure controls and procedures were not effective due to the material weaknesses in our internal control over financial reporting described above.

However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Quarterly Report were prepared in accordance with U.S. GAAP, *our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP*.

(Emphasis added.)

103.   Further, the subsection of "Controls and Procedures" titled "Changes in Internal Control Over Financial Reporting" stated the following:

Other than described above in this Item 4, *there has been no change in our internal control over financial reporting during the fiscal quarter ended*

31

Verified Shareholder Derivative Complaint

*March 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.*

(Emphasis added.)

104.   The statements in the 1Q 2021 10-Q, as referenced in paragraphs ¶¶ 100-104 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### August 16, 2021 Form 10-Q

105.   On August 16, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2021 (the "2Q 2021 10-Q"), which was signed by Defendants Galletti and Dieckmann. Attached to the 2Q 2021 10-Q were certifications pursuant to Rule 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Galletti and Dieckmann attesting to the accuracy of the 2Q 2021 10-Q.

106.   The 2Q 2021 10-Q revealed that, for the three months ended June 30, 2021, the Company reported a net revenue of $50,716,000 and a net loss of $53,196,000. It further revealed that, for the six months ended June 30, 2021, the Company reported a net revenue of $103,398,000 and a net loss of $61,348,000.

107.   The 2Q 2021 10-Q also downplayed the serious problems the Company was facing with its internal controls. The subsection of "Controls and Procedures" titled "Evaluation of Disclosure Controls and Procedures" stated the following, in relevant part:

Our management, with the participation of our chief executive officer and chief financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of June 30, 2021, our disclosure controls and procedures were not effective due to the material weaknesses in our internal control over financial reporting described above.

However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Quarterly Report were prepared in accordance with U.S. GAAP, *our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP*.

(Emphasis added.)

108. Further, the subsection of "Controls and Procedures" titled "Changes in Internal Control Over Financial Reporting" stated the following:

Other than described above in this Item 4, *there has been no change in our internal control over financial reporting during the fiscal quarter ended June 30, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting*.

(Emphasis added.)

109. The statements in the 2Q 2021 10-Q, as referenced in paragraphs ¶¶ 106-108 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *November 22, 2021 Form 10-Q*

110. On November 22, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021 (the "3Q 2021 10-Q"), which was signed by Defendants Galletti and Dieckmann. Attached to the 3Q 2021 10-Q were certifications pursuant to Rule 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Galletti and Dieckmann attesting to the accuracy of the 3Q 2021 10-Q.

111. The 3Q 2021 10-Q revealed that, for the three months ended September 30, 2021, the Company reported a net revenue of $58,780,000 and a net loss of $8,174,000. It further revealed that, for the nine months ended September 30, 2021, the Company reported a net revenue of $161,972,000 and a net loss of $70,095,000.

112. The 3Q 2021 10-Q also downplayed the serious problems the Company was facing with its internal controls. The subsection of "Controls and Procedures" titled "Evaluation of Disclosure Controls and Procedures" stated the following, in relevant part:

> Our management, with the participation of our chief executive officer and chief financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of September 30, 2021, our disclosure controls and procedures were not effective due to the material weaknesses in our internal control over financial reporting described above.
>
> However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Quarterly Report were prepared in accordance with U.S. GAAP, ***our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP***.

(Emphasis added.)

113.   Further, the subsection of "Controls and Procedures" titled "Changes in Internal Control Over Financial Reporting" stated the following:

> Other than described above in this Item 4, *there has been no change in our internal control over financial reporting during the fiscal quarter ended September 30, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting*.

(Emphasis added.)

114.   The statements in the 3Q 2021 10-Q, as referenced in paragraphs ¶¶ 111-113 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*March 11, 2022 Press Release*

115.   On March 11, 2022, the Company issued a press release revealing that on March 7, 2022, the Board "concluded that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021, each as previously filed with the [SEC], should no longer be relied upon because the Company did not properly record the tax effects associated with the Company's issuance of 825,000 shares of its common stock to Harrison Co. in June 2021 as partial consideration for services rendered in connection with the Company's de-SPAC transaction that occurred in October 2020." The Board reached this conclusion

"based on consultation with Company management and upon the recommendation of the Audit Committee."

116.   As a result, the Company disclosed that it would "restate the unaudited consolidated financial statements" at issue.

117.   On this news, the Company's share price fell $1.03 per share, or 9.07%, from closing at $11.36 per share on March 11, 2022 to close at $10.33 per share on March 14, 2022.

### March 16, 2022 Form 10-K

118.   On March 16, 2022, the Company filed the 2021 10-K with the SEC for the fourth quarter and full year 2021, ended December 31, 2021, which was signed by Defendants Galletti, Dieckmann, Rosenberg, Ciaramitaro, Gelfand, Williamson, Fellner, Boris, and Quintero-Johnson. Attached to the 2021 10-K were certifications pursuant to Rule 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Galletti and Dieckmann attesting to the accuracy of the 2021 10-K.

119.   The 2021 10-K revealed that, for the 2021 Fiscal Year, the Company reported a net revenue of $213,430,000 and a net loss of $87,404,000.

120.   The 2021 10-K downplayed the serious problems the Company was facing with its internal controls. The subsection of "Controls and Procedures" titled "Material Weaknesses in Internal Control Over Financial Reporting" stated the following, in relevant part:

> However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Annual Report on Form 10-K were prepared in accordance with U.S. GAAP, ***our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP***.

(Emphasis added.)

121.   Further, the subsection of "Controls and Procedures" titled "Remediation of Material Weaknesses" stated the following:

> We have begun the process of, and we are focused on, designing and implementing effective measures to improve our internal controls over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:
>
> ● Hired qualified staff and outside resources to segregate key functions within our financial and information technology processes supporting our internal controls over financial reporting;
> ● Hired several qualified accounting professionals with appropriate level of expense and training to design, maintain and improve our accounting policies, procedures and controls to prevent and detect material misstatements related to the presentation and disclosures of the consolidated financial statements;
> ● Developed internal controls documentation, including comprehensive accounting policies and procedures over certain key financial processes and related disclosures; and,
> ● Drafted position papers for all complex, non-recurring transactions.
>
> While these actions and planned actions are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles, *we are committed to the continuous improvement of our internal control over financial reporting and will continue to diligently review our internal control over financial reporting*.

(Emphasis added.)

122.   Additionally, the subsection of "Controls and Procedures" titled "Changes in Internal Control Over Financial Reporting" stated the following:

> Other than described above in this Item 9A, *there has been no change in our internal control over financial reporting during the fiscal year ended December 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting*.

(Emphasis added.)

123.   The statements contained in the 2021 10-K, as referenced in paragraphs ¶¶ 119-122 above, were materially false and/or misleading and failed to disclose material

adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 21, 2022 Proxy Statement*

124.  On April 21, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Fellner, Gelfand, Williamson, Ciaramitaro, Galletti, Rosenberg, Boris, Olohan, and Quintero-Johnson solicited the 2022 Proxy Statement which contained material misstatements and omissions.

125.  The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Fellner, Gelfand, and Williamson to the Board; and (2) ratify the appointment of Deloitte & Touche, LLP ("Deloitte") as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.

126.  With respect to the Company's Code of Ethics, the 2022 Proxy Statement stated the following:

> We have adopted a code of ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. The code of ethics is available on our website at www.tattooedchef.com. To the extent required by law, we expect to disclose any amendments to the code, or any waivers of its requirements, on our website.

127.  Regarding the "Board's Role in Risk Oversight," the 2022 Proxy Statement stated the following:

> Our Board has ultimate responsibility for oversight of our risk management processes. Our Board discharges this oversight responsibility through regular reports received from and discussions with senior management on areas of

Verified Shareholder Derivative Complaint

material risk exposure to us. Our Board has overall responsibility for risk oversight, including, as part of regular Board and committee meetings, general oversight of executives' management of risks relevant to our business. While the full Board has overall responsibility for risk oversight and is currently overseeing our business continuity risks, such as risks relating to the COVID-19 pandemic, it is supported in this function by the audit committee, compensation committee, nominating and corporate governance committee, and food safety committee. Each of the committees regularly reports to our Board.

128.   The 2022 Proxy Statement was materially misleading because it failed to disclose that: (1) though the Company claimed its employees, officers and directors adhered to the Code of Ethics and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Ethics either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it.

129.   The 2022 Proxy Statement was also materially misleading because it failed to disclose, *inter alia*, that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

130.   As a result of Defendants Fellner, Gelfand, Williamson, Ciaramitaro, Galletti, Rosenberg, Boris, Olohan, and Quintero-Johnson causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to elect Defendants Fellner, Gelfand, and Williamson to the Board, allowing them to continue to breach their fiduciary duties to the Company.

**The Truth Fully Emerges**

131.   On October 12, 2022, the Company revealed on a Form 8-K filed with the SEC (the "October 12th 8-K") that it would be restating its financial statements filed with the SEC between March 31, 2021 and October 12, 2022 because they contained various errors. In particular, the October 12th 8-K stated the following about the Company's need for a restatement:

> On October 6, 2022, Tattooed Chef, Inc. (the "Company") received a written notice pursuant to Item 4.02(b) from the Company's former independent registered public accounting firm, BDO USA, LLP, that ***the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021, and its audited annual consolidated financial statements for the year ended December 31, 2021, and accompanying audit report, each as previously filed with the Securities and Exchange Commission ("SEC"), were materially misstated and should no longer be relied upon and should be restated***, because the Company ***(a) incorrectly recorded expenses related to a multi-vendor mailer program with a large customer as operating expenses rather than as a reduction of revenue; and (b) incorrectly recorded expenses for advertising placement by a marketing services firm on a straight-line basis over the life of the contract rather than when the services were actually rendered.*** For these reasons, pursuant to Item 4.02(a) the Board, after consultation with the Audit Committee, has also determined that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2022 and June 30, 2022 should no longer be relied upon.

(Emphasis added.)

132.   The October 12th 8-K stated the following regarding the estimated impact of these restatements on the Company for the three months ended March 31, 2021:

> ***The estimated impact of these restatements*** on the Company's unaudited interim condensed consolidated financial statements ***for the three months ended March 31, 2021 is expected to be a $2 million decrease in revenue, a $2 million decrease in gross profit, a $3 million decrease in operating expenses, and a $1 million decrease in net loss***.

(Emphasis added.)

133.   The October 12th 8-K stated the following regarding the estimated impact of these restatements on the Company for the three months and six months ended June 30, 2021:

> ***The estimated impact of these restatements*** on the Company's unaudited interim condensed consolidated financial statements ***for the three months ended June 30, 2021 is expected to be a $3 million decrease in revenue, a $3 million decrease in gross profit, a $1 million increase in operating expenses, and a $4 million increase in net loss***.

> ***The estimated impact of these restatements for the six months ended June 30, 2021 is expected to be a $5 million decrease in revenue, a $5 million decrease in gross profit, a $2 million decrease in operating expenses, and a $3 million increase in net loss***.

(Emphasis added.)

134.   The October 12th 8-K stated the following regarding the estimated impact of these restatements on the Company for the three months and nine months ended September 30, 2021:

> ***The estimated impact of these restatements*** on the Company's unaudited interim condensed consolidated financial statements ***for the three months ended September 30, 2021 is expected to be a $0.6 million decrease in operating expenses and a $0.5 million decrease in net loss***.

> ***The estimated impact of these restatements for the nine months ended September 30, 2021 is expected to be a $5 million decrease in revenue, a $5 million decrease in gross profit, a $3 million decrease in operating expenses, and a $2 million increase in net loss***.

(Emphasis added.)

135.   The October 12th 8-K stated the following regarding the estimated impact of these restatements on the Company for the twelve months ended December 31, 2021:

> ***The estimated impact of the restatements*** on the Company's annual consolidated financial statements ***for the twelve months ended December 31, 2021 is expected to be a $5 million decrease in revenue, a $5 million decrease in gross profit, a $4 million decrease in operating expenses, and a $1 million increase in net loss***.

(Emphasis added.)

136.   The October 12th 8-K stated the following regarding the estimated impact of these restatements on the Company for the three months ended March 31, 2022:

> *The estimated impact of these restatements* on the Company's unaudited interim condensed consolidated financial statements *for the three months ended March 31, 2022 is expected to be a $4 million decrease in revenue, a $4 million decrease in gross profit, a $1 million decrease in operating expenses, and a $3 million increase in net loss*.

(Emphasis added.)

137.   The October 12th 8-K stated the following regarding the estimated impact of these restatements on the Company for the three months and sixth months ended June 30, 2022:

> *The estimated impact of these restatements* on the Company's unaudited interim condensed consolidated financial statements *for the three months ended June 30, 2022 is expected to be less than a $1 million decrease in revenue, decrease in gross profit, increase in operating expenses and increase in net loss*.

> *The estimated impact of these restatements for the six months ended June 30, 2022 is expected to be a $5 million decrease in revenue, a $5 million decrease in gross profit, a $1 million decrease in operating expenses, and a $4 million increase in net loss*.

(Emphasis added.)

138.   On this news, Tattooed Chef's share price fell $0.44 per share, or 9.8%, from closing at $4.49 per share on October 12, 2022 to opening at $4.05 per share on October 13, 2022.

## DAMAGES TO TATTOOED CHEF

139.   As a direct and proximate result of the Individual Defendants' conduct, Tattooed Chef has lost and will continue to lose and expend many millions of dollars.

140.   Such expenditures include, but are not limited to, the costs, legal fees, arbitration fees, and/or other fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

141. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

142. As a direct and proximate result of the Individual Defendants' conduct, Tattooed Chef has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

143. Plaintiff brings this action derivatively and for the benefit of Tattooed Chef to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Tattooed Chef, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

144. Tattooed Chef is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

145. Plaintiff is, and has been at all relevant times, a shareholder of Tattooed Chef. Plaintiff will adequately and fairly represent the interests of Tattooed Chef in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

146. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

147. A pre-suit demand on the Board of Tattooed Chef is futile and, therefore, excused. At the time of the filing of this complaint, the Board consists of the following nine individuals: Defendants Galletti, Boris, Ciaramitaro, Fellner, Gelfand, Olohan,

Quintero-Johnson, Rosenberg, and Williamson (collectively, the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants that were on the Board at the time of the filing of this complaint.

148.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, while one of them engaged in insider sales based on material non-public information, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

149.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

150.   Moreover, Defendants Galletti, Boris, Ciaramitaro, Fellner, Gelfand, Olohan, Quintero-Johnson, Rosenberg, and Williamson caused the 2021 Proxy Statement to call for a shareholder vote to approve the Incentive Amendment Proposal, which provided for a $25,000 increase of the maximum annual amount of shares that may be granted under the Plan to any non-employee director who serves as chairperson of a Board committee, when taken together with any cash fees paid to that director, from $100,000 (under the existing Plan) to $125,000 (under the Incentive Amendment Proposal). The misrepresentations and omissions set forth herein were material to shareholders in voting on the Incentive Amendment Proposal who would not have

approved the Incentive Amendment Proposal had they been informed about the Individual Defendants' materially false and misleading statements and omissions regarding the overall health of the Company. As a result of shareholder approval of the Incentive Amendment Proposal, Defendants Gelfand and Rosenberg undeservedly received approximately $125,000 each in performance-based stock awards during the 2021 Fiscal Year. For this reason, too, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

151.   Additional reasons that demand on Defendant Galletti is futile follow. Defendant Galletti is the Company's CEO, President, the Chairman of the Board, and a controlling shareholder of the Company. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Galletti with his principal occupation for which he receives handsome compensation. As CEO, Defendant Galletti was ultimately responsible for all of the materially false and misleading statements and omissions that were made during the Relevant Period, including those which he signed in the 2020 10-K, the 1Q 2021 10-Q, the 2Q 2021 10-Q, the 3Q 2021 10-Q, and the 2021 10-K. As the Company's highest officer and as the trusted Board Chairman, Defendant Galletti conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Galletti's insider sales, which yielded approximately $8,000,000 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Galletti is a defendant in the Securities Class Action. For these reasons, Defendant Galletti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.   Additional reasons that demand on Defendant Boris is futile follow. Defendant Boris has served as a Company director since 2018. He also serves as a

member of the Compensation Committee. Additionally, Defendant Boris has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in corporate finance, investment banking, and capital market activities. Furthermore, Defendant Boris signed the 2020 10-K and the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Boris breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.   Additional reasons that demand on Defendant Ciaramitaro is futile follow. Defendant Ciaramitaro has served as a Company director since 2020. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Additionally, Defendant Ciaramitaro has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. This is even more alarming considering her extensive background as a financial executive. Furthermore, Defendant Ciaramitaro signed the 2020 10-K and the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Ciaramitaro breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

154.   Additional reasons that demand on Defendant Fellner is futile follow. Defendant Fellner has served as a Company director since 2020. She also serves as a

member of the Compensation Committee. Additionally, Defendant Fellner has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Fellner signed the 2020 10-K and the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Fellner breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

155.   Additional reasons that demand on Defendant Gelfand is futile follow. Defendant Gelfand has served as a Company director since 2020. He also serves as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Additionally, Defendant Gelfand has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in public company filings. Furthermore, Defendant Gelfand signed the 2020 10-K and the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Gelfand breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.   Additional reasons that demand on Defendant Olohan is futile follow. Defendant Olohan has served as a Company director since 2020. He also serves as Chairman of the Food Safety Committee. Additionally, Defendant Olohan has received

and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Olohan signed the 2020 10-K which contained false and misleading statements. For these reasons, Defendant Olohan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.   Additional reasons that demand on Defendant Quintero-Johnson is futile follow. Defendant Quintero-Johnson has served as a Company director since 2020. She also serves as a member of the Audit Committee and the Food Safety Committee. Additionally, Defendant Quintero-Johnson has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. This is even more alarming considering her extensive background in accounting. Furthermore, Defendant Quintero-Johnson signed the 2020 10-K and the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Quintero-Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

158.   Additional reasons that demand on Defendant Rosenberg is futile follow. Defendant Rosenberg has served as a Company director since 2020. He also serves as Chairman of the Compensation Committee and as a member of the Food Safety Committee. Additionally, Defendant Rosenberg has received and continues to receive

compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Rosenberg signed the 2020 10-K and the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Rosenberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.   Additional reasons that demand on Defendant Williamson is futile follow. Defendant Williamson has served as a Company director since 2020. He also serves as Chairman of the Nominating and Corporate Governance Committee. Additionally, Defendant Williamson has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. This is even more alarming considering his extensive background in operations, finance, and accounting. Furthermore, Defendant Williamson signed the 2020 10-K and the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Williamson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.   Additional reasons that demand on the Board is futile follow.

161.   Moreover, Defendants Ciaramitaro, Gelfand, and Quintero-Johnson served as members of the Audit Committee during the Relevant Period, with Defendant Gelfand serving as Chairman. In violation of the Audit Committee Charter, Defendants

Ciaramitaro, Gelfand, and Quintero-Johnson failed to adequately review and discuss the Company's Forms 10-K, Forms 10-Q, and proxy statements; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Ciaramitaro, Gelfand, and Quintero-Johnson further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

162. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

163. Tattooed Chef has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Tattooed Chef any part of the damages Tattooed Chef suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

164. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-

Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

165.   The acts complained of herein constitute violations of fiduciary duties owed by Tattooed Chef's officers and directors, and these acts are incapable of ratification.

166.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Tattooed Chef. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Tattooed Chef, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

167.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Tattooed Chef to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

168.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

169.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

171.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

172.   Under the direction and watch of the Director-Defendants, the 2021 Proxy Statement and 2022 Proxy Statement (the "Proxy Statements") failed to disclose that contrary to the Proxy Statements' descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

173. The Proxy Statements also failed to disclose that: (1) the Company continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Proxy Statements were materially false and misleading.

174. The Individual Defendants also caused the 2021 Proxy Statement to be false and misleading with regard to executive compensation in that it purported to employ performance-based compensation elements while failing to disclose that the Company's revenues and losses, and therefore its financial performance, were misrepresented as a result of false and misleading statements, thus allowing the Individual Defendants to wrongfully benefit from the misconduct alleged herein.

175. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval of the Incentive Amendment Proposal.

176. The misrepresentations and omissions set forth herein were material to shareholders in voting on the Incentive Amendment Proposal who would not have approved, among other things, Defendants Gelfand's and Rosenberg's compensation under the Incentive Amendment Proposal, had they been informed about the false and misleading statements discussed herein. As a result of shareholder approval of the Incentive Amendment Proposal, Defendants Gelfand and Rosenberg undeservedly received approximately $125,000 each in performance-based stock awards during the 2021 Fiscal Year.

177.   The false and misleading elements of the 2021 Proxy Statement led to, among other things, the approval of the Incentive Amendment Proposal and the election or re-election of Defendants Boris, Olohan, and Quintero-Johnson to the Board, which allowed them to breach or continue to breach their fiduciary duties to Tattooed Chef.

178.   The false and misleading elements of the 2022 Proxy Statement led to, among other things, the election or re-election of Defendants Fellner, Gelfand, and Williamson to the Board, which allowed them to breach or continue to breach their fiduciary duties to Tattooed Chef.

179.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

180.   Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Breach of Fiduciary Duties and/or Insider Selling**

181.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.   Each Individual Defendant owed to the Company the duty to exercise candor, food faith, and loyalty in the management and administration of Tattooed Chef's business and affairs.

183.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

184.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Tattooed Chef.

185.   In breach of their fiduciary duties owed to Tattooed Chef, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company

continuously downplayed its serious problems with internal controls; (2) Tattooed Chef's financial statements filed during the Relevant Period contained "certain errors" such as overstating revenue and understating losses; and (3) due to this, the Company would need to restate its previously filed financial statements for certain periods. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

186.   The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

187.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

188.   In addition, Defendant Galletti further breached his fiduciary duties and was unjustly enriched to the detriment of the Company by engaging in insider sales while in possession of material nonpublic information pertaining to the Company's business.

189.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tattooed Chef's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

190.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

191.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tattooed Chef has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.   Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

193.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tattooed Chef.

195.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Tattooed Chef that was tied to the performance or artificially inflated valuation of Tattooed Chef, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

196.   Plaintiff, as a shareholder and a representative of Tattooed Chef, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

197.   Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

198.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Tattooed Chef, for which they are legally responsible.

200.   As a direct and proximate result of the Individual Defendants' abuse of control, Tattooed Chef has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Tattooed Chef has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201.   Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

202.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tattooed Chef in a manner consistent with the operations of a publicly-held corporation.

204.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Tattooed Chef has sustained and will continue to sustain significant damages.

205.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

206.   Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

### SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

207.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

209.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Tattooed Chef to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

210.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

211.   Plaintiff, on behalf of Tattooed Chef, has no adequate remedy at law.

### SEVENTH CLAIM

### Against Defendants Galletti and Dieckmann for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

212.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.   Tattooed Chef, Defendant Galletti, and Defendant Dieckmann are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Galletti's and Dieckmann's willful

and/or reckless violations of their obligations as controlling shareholder, officers and/or directors of Tattooed Chef.

214.   Defendants Galletti and Dieckmann, because of their positions of control and authority as controlling shareholder, officers and/or directors of Tattooed Chef, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Tattooed Chef, including the wrongful acts complained of herein and in the Securities Class Action.

215.   Accordingly, Defendants Galletti and Dieckmann are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

216.   As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Galletti and Dieckmann.

## **PRAYER FOR RELIEF**

217.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Tattooed Chef, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Tattooed Chef;

(c)   Determining and awarding to Tattooed Chef the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Tattooed Chef and the Individual Defendants to take all necessary actions to reform and improve Tattooed Chef's corporate governance and internal procedures to comply with applicable laws and to protect Tattooed Chef and its shareholders from a repeat of the damaging events described herein, including, but not

limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2. a provision to permit the shareholders of Tattooed Chef to nominate at least five candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Tattooed Chef restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 17, 2023                 Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

_/s/ Robert C. Moest_
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

Verified Shareholder Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
            shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Terry Bassett Jr, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of_____, 2023.

3/15/2023

DocuSigned by:

1E12AE809CDF4D0...